**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**NORTHERN DIVISION**
**No. 2:22-cv-00036**

| | | |
|---|---|---|
| **BOBBI SISON, individually and on behalf of all others similarly situated,** | : | |
| | : | |
| **Plaintiff,** | : | **Class and Collective Action Complaint** |
| | : | |
| **v.** | : | |
| | : | **Jury Trial Demanded** |
| **SABER HEALTHCARE GROUP, LLC;** | : | |
| **SABER GOVERNANCE, LLC;** | : | |
| **CURRITUCK HEALTH & REHAB** | : | |
| **CENTER, LLC; and JOHN DOES 1-10,** | : | |
| | : | |
| **Defendants.** | : | |

## CLASS AND COLLECTIVE ACTION COMPLAINT

Plaintiff Bobbi Sison ("Plaintiff"), individually and on behalf of all persons similarly situated, brings this class and collective action complaint for unpaid off-the-clock and overtime compensation against her employers, Saber Healthcare Group, LLC ("Saber Healthcare"), Saber Governance, LLC ("Saber Governance"), Currituck Health & Rehab Center, LLC ("Currituck Health"), and John Does 1-10 (collectively, "Defendants"). Plaintiff brings this lawsuit as a collective action under the Fair Labor Standards Act, 29 U.S.C. §§ 201 to 219 ("FLSA") and as a class action under North Carolina state wage and hour laws, seeking unpaid overtime compensation, liquidated damages, pre-judgment and post-judgment interest, and attorneys' fees and costs, against Defendants for their unlawful and willful actions. The following allegations are based on personal knowledge as to Plaintiff's own conduct and on information and belief as to the acts of others.

## INTRODUCTION

1. Saber Healthcare is a for-profit corporation that provides skilled nursing, long-term

and senior rehabilitation care at its facilities throughout the United States. As a centralized enterprise, Saber Healthcare operates more than 115 facilities across 7 states—Delaware, Florida, Indiana, North Carolina, Ohio, Pennsylvania, and Virginia.

2. Saber Governance is a Saber Healthcare subsidiary that manages at least 16 skilled nursing, long-term and/or senior rehabilitation centers in North Carolina.

3. Currituck is a Saber Governance subsidiary that operates a skilled nursing, long-term and senior rehabilitation center in Eastern North Carolina.

4. Defendants employ non-exempt healthcare workers to provide care to seniors across their locations. During the COVID-19 pandemic, these frontline workers have risked their lives to continue providing excellent senior citizen care.

5. This case is about Defendants' knowing and willful failure to pay their hourly employees—frontline healthcare workers who continue to face heightened risks as we enter the third year of the COVID-19 pandemic—for all hours worked, including overtime, as required by the FLSA.

## JURISDICTION AND VENUE

6. Jurisdiction over Plaintiff's FLSA claim is proper under 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

7. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims, because those claims derive from a common nucleus of operative facts with Plaintiff's FLSA claim.

8. Venue is proper in this District Court pursuant to 28 U.S.C. § 1391(b)(2) since Defendant Currituck Health & Rehab Center, LLC does business in this District and is subject to personal jurisdiction in this District, and since a substantial part of the events giving rise to

Plaintiff's claims occurred within this District.

9. Upon information and belief, Defendant Saber Governance, LLC is a Saber Healthcare subsidiary that manages at least 16 skilled nursing, long-term and/or senior Saber Healthcare rehabilitation facilities in North Carolina—including Defendant Currituck Health's facility.

10. Upon information and belief, Defendant Saber Healthcare is likewise subject to general personal jurisdiction in North Carolina because Saber Healthcare has continuous and systemic contacts in North Carolina, including maintaining offices, employees, and extensive contracts with the State by way of Saber Healthcare's numerous subsidiaries/wholly owned corporate entities in North Carolina. Saber Healthcare manages, operates, and/or oversees, either in whole or in part with Saber Healthcare's subsidiaries or partner corporate entities in the State, no less than 25 separate facilities within North Carolina.[1]

## **PARTIES**

11. Plaintiff is a Certified Nursing Assistant who worked for Defendants from approximately December 2020 to April 2021. Plaintiff is a citizen of North Carolina and resides in Elizabeth City, North Carolina. Pursuant to 29 U.S.C. § 216(b), Plaintiff has consented to being a plaintiff in this action. *See* Exhibit A.

12. Defendant Saber Healthcare Group, LLC is a foreign corporation that provides nursing, long-term and senior rehabilitation care throughout 7 states in the United States. Its principal offices are located at 26691 Richmond Road, Bedford Heights, Ohio 44146.

13. Defendant Saber Healthcare Group, LLC's registered agent for service of process is Gregory Nicoluzakis, Esq., 23700 Commerce Park, Beachwood, Ohio 44122.

---

[1] *See* https://www.saberhealth.com/locations/state/north-carolina, (last visited, July 27, 2022).

14.     Defendant Saber Governance, LLC is a foreign corporation that manages at least 16 skilled nursing, long-term and/or senior rehabilitation centers in North Carolina. Its principal offices are located at 23700 Commerce Park, Beachwood, Ohio 44122.

15.     Upon information and belief, Saber Healthcare is doing business in North Carolina by and through its wholly owned corporate affiliate/subsidiary/partner, Saber Governance. Saber Governance has been continuously doing business in North Carolina since as early as 2010.

16.     Defendant Saber Governance, LLC's registered agent for service of process is Gregory Nicoluzakis, Esq., 23700 Commerce Park, Beachwood, Ohio 44122.

17.     Defendant Currituck Health & Rehab Center, LLC is a domestic corporation that operates a skilled nursing, long-term and senior rehabilitation center in North Carolina. Its principal office is located at 23700 Commerce Park, Beachwood, Ohio 44122.

18.     Defendant Currituck Health & Rehab Center, LLC's registered agent for service of process in North Carolina is CT Corporation, 160 Mine Lake Ct, Ste 200, Raleigh, North Carolina 27615.

19.     Defendant Currituck Health & Rehab Center, LLC was purchased by Saber Healthcare in July of 2019 and is a subsidiary of Saber Healthcare.

20.     Defendant Currituck Health & Rehab Center, LLC is managed by Saber Governance, LLC.

21.     John Does 1 through 10 are other persons or entities associated with Defendants who participated in the violations alleged herein but whose identity is presently unknown.

22.     Defendants are joint employers of Plaintiff and the Classes (defined below).

23.     At all times relevant to this action, Defendants employed individuals engaged in

commerce or in the production of goods for commerce and/or handling, selling, or otherwise working on goods or materials that have been moved in or produced in commerce by any person, as defined by the FLSA, 29 U.S.C. §§ 206-207.

24. Defendants' annual gross volume of business exceeds $500,000.

## COLLECTIVE AND CLASS DEFINITIONS

25. Plaintiff brings Count I of this lawsuit as a collective action pursuant to the FLSA, 29 U.S.C. § 216(b), on behalf of herself and other similarly situated individuals, consisting of:

> All current and former non-exempt hourly employees employed by Saber Healthcare Group, LLC, Saber Governance, LLC, and/or Currituck Health & Rehab Center, LLC, in the United States who worked more than forty hours in any workweek during the applicable limitations period and who were not paid overtime at a rate of one-and-one-half times their regular hourly rate for all hours worked over forty (the "FLSA Collective").

26. Plaintiff brings Count II of this lawsuit as a class action pursuant to Fed. R. Civ. P. 23, on behalf of herself and the following class:

> All current and former non-exempt hourly employees employed by Saber Healthcare Group, LLC, Saber Governance, LLC, and/or Currituck Health & Rehab Center, LLC, in North Carolina who worked more than forty hours in any workweek during the applicable limitations period and who were not paid overtime at a rate of one-and-one-half times their regular hourly rate for all hours worked over forty (the "North Carolina Class").

27. The FLSA Collective and the North Carolina Class are together referred to as the "Classes," and the members of the Classes are referred to as "Class Members."

28. Plaintiff reserves the right to redefine the Classes prior to notice or class certification, and thereafter, as may be warranted or necessary.

## FACTUAL ALLEGATIONS

### Defendants Are Joint Employers

29. Saber Healthcare holds itself out as a skilled nursing, long-term and/or senior

5

rehabilitation provider that owns, operates, and/or manages a network of 115 locations throughout 7 states in the United States—Delaware, Florida, Indiana, North Carolina, Ohio, Pennsylvania, and Virginia. The local administrators at these facilities, including Currituck Health, report directly to Saber Healthcare's regional vice president or other regional manager/supervisor.

30.　　Saber Healthcare, as the owner and/or operator of the facility where Plaintiff and the Class Members work, has the power to hire and fire Plaintiff and other workers in its role as the managing/operating entity over these facilities. Saber Healthcare does not all allow any of their facilities, including Currituck Health, to terminate anyone without first getting approval from Saber Healthcare.

31.　　Saber Healthcare hires department managers at the nursing facilities, who are responsible for interviewing and hiring employees at these facilities. The ultimate decision on hiring or firing with respect to workers, like Plaintiff and those similarly situated, at the facilities rests with Saber Healthcare's corporate office.

32.　　Saber Healthcare determines Plaintiff's, and those similarly situated, non-exempt and hourly-rate status by promulgating guidelines that its nursing facilities are required to follow with respect to setting the compensation for Plaintiff and those similarly situated.

33.　　Saber Healthcare also has the power to institute sweeping compensation policy changes across all of its facilities any time it deems necessary.

34.　　On July 2, 2019, Saber Healthcare announced on its website that it had acquired a "group of skilled nursing facilities [(including Currituck Health & Rehab Center, LLC)] to its growing company that now includes more than 118 skilled nursing facilities in Ohio, Pennsylvania, Florida, Indiana, Delaware, North Carolina, and Virginia."[2]

---

[2] https://www.saberhealth.com/news/in-the-news/saber-healthcare-group-acquires-facilities-in-virginia-north-carolina, (last visited July 27, 2022).

35. Indeed, Saber Healthcare holds Currituck Health as its own and uses such statements on its "Currituck Health & Rehab Center" webpage on the Saber Healthcare website:

> Our skilled nursing team will shape treatment around your needs[] and touts the Currituck Health facility's award from the American Health Care Association (AHCA) as part of the 2020 Quality Initiative Recognition Program.[3]

36. Additionally, Saber Healthcare states on its "Why Saber" webpage:

> We recruit and select top-flight physicians, nurses and staff. Our facilities feature the latest medical technology, and we invest in professional development, so we keep improving and you keep getting the best care possible. Our dedication to competent, compassionate, customized care starts with Saber's expert staff.[4]

37. Saber Healthcare mandates leadership retreats for leaders of its subsidiary locations. For example, on March 31, 2022, Saber Healthcare announced that it held a leadership meeting, in North Carolina "for Saber [Healthcare's] leaders to reconnect with one another, share news, gain wisdom from speakers, and discuss our company's future direction."[5]

38. Saber Healthcare relies on its subsidiaries, such as Saber Governance, to manage its locations within their respective states such that they align with Saber's commitment to offering individualized care in a warm environment for senior living.

39. Saber Healthcare and Saber Governance share the same registered agent for service of process is Gregory Nicoluzakis, Esq., at the same address, 23700 Commerce Park, Beachwood, Ohio 44122.

40. To present itself as a unified and cohesive enterprise, Saber exerts substantial operational control over its subsidiaries. For example, Saber Healthcare's image as a centralized enterprise is consistent in its provision of general information to the broader public, including

---

[3] https://www.saberhealth.com/locations/currituck-health-rehab-center, (last visited July 27, 2022).
[4] https://www.saberhealth.com/why-saber, (last visited July 27, 2022).
[5] https://www.saberhealth.com/news/in-the-news/saber-healthcare-2022-leadership-meeting, (last visited July 27, 2022).

prospective patients and their families. For instance, at the end Saber Healthcare's webpage news articles, it states:

> Established in 2001, the Cleveland-based company has grown from two skilled nursing facilities to more than 115 skilled nursing and assisted living facilities in seven states (Ohio, Indiana, Pennsylvania, Delaware, Virginia, North Carolina and Florida). Saber's "On the Cutting Edge of Healthcare" philosophy has spurred its growth and the company to implement greater healthcare knowledge and technologies to serve residents and patients in better ways.[6]

41.     Notably, prospective patients seeking information about on the internet about any of Defendants' locations, are directed to Saber Healthcare's website, instead of a separate website containing a different URL for the specific location. Once on Saber Healthcare's website, prospective patients can even click the location tool to narrow their search by state for a Saber Healthcare location within Saber Healthcare's network and learn more about each location while staying on Saber Healthcare's website, where Saber Healthcare's emblem is displayed on every page and Saber Healthcare's name is displayed in every URL. For example, the webpage for Defendants' Currituck Health location appears as follows:



---

[6] *Id.*

42.     Thus, Defendants' web design and presentation is consistent across all locations and subsidiaries.

43.     In Defendants' provision of information to their employees regarding their policies and procedures, Defendants similarly maintain streamlined, consistent messaging across all subsidiaries and locations. For example, all Currituck Health employees receive e-mail correspondence from accounts under a Saber Healthcare domain name:



44.     Additionally, Plaintiff accesses her employee information on "Saber Healthcare's proprietary company portal—and utilizes Saber Health's timekeeping and payroll system, which Plaintiff accesses from the Saber Health website via Defendants' desktop computer.

45.     Furthermore, all of Defendants' employees are subject to the same standards of

conduct rooted in Saber Healthcare's mission and values. To illustrate, Saber Healthcare also drafts and develops policies and procedures affecting the day-to-day employment conditions for Plaintiff, and those similarly situated, that are set forth in the code of conduct handbook issued to each employee at Saber Healthcare-ran facilities. These specific policies, procedures, and practices are applicable to all employees, regardless of their specific job title or location, and effect and control Plaintiff's, and those similarly situated, conditions of employment. The content included in these handbooks include policies related to overtime, hours of work, family and medical leave policies, paid time off practices, attendance and punctuality, recording hours worked, personnel records, e-mail and internet usage policies, and personal appearance expectations.

46.     Plaintiff's, and those similarly situated, time records are sent directly to Saber Healthcare's corporate office, where Saber Healthcare calculates payroll. To illustrate, Plaintiff's Paystubs include Saber Healthcare's letterhead:



47.     Saber Healthcare also controlled its merit and award nomination process. The "Impact" award nomination document for employees was presented in Saber Healthcare's

letterhead:



**Defendants Fail To Pay Proper Overtime Compensation**

48.    Against the backdrop of the strained healthcare and nursing systems due in large part to staffing shortages and unprecedented hospitalization levels, healthcare and nursing care providers have deployed various strategies to address these staffing shortages and hedge against employee burnout while continuing to deliver high-quality patient care.

49.    Skilled nursing, long-term and senior rehabilitation center providers were not spared from staffing shortages that adversely impacted the rest of the healthcare system.

50.    To this end, Defendants used, and continue to use, the use of mechanisms, particularly in the form of shift differential pay, that provide incentive to non-exempt healthcare employees for working extra shifts that are sometimes deemed less desirable during periods of critical staffing shortages partially due to the ongoing COVID-19 pandemic.

51.    Plaintiff worked for Defendants as a Certified Nursing Assistant at Currituck Health & Rehab Center and was typically scheduled to work two fifteen (15) hour shifts each week. However, Plaintiff often worked sixty (60) to eighty (80) hours a week—which resulted in twenty (20) to forty (40) hours of overtime per week. Plaintiff observed that other Class Members

were scheduled to work, and indeed worked, similar schedules and worked analogous overtime hours.

52.    Defendants offer Plaintiff, and those similarly situated, various non-discretionary bonuses and additional compensation amounts, including, *inter alia*, shift differential pay.

53.    Plaintiff's shift differential pay included an increase of $2 to her hourly rate for second and third shifts, in addition to her $14 preexisting hourly rate. However, Plaintiff's shift differential pay was not included when calculating Plaintiff's overtime rate.

54.    Non-discretionary extra payments and shift differential amounts should be included in the employee's regular rate of pay. The Supreme Court has specifically interpreted Section 207(e) of the FLSA to include shift differential pay into an employee's "regular rate":

> Where an employee receives a higher wage or rate because of undesirable hours or disagreeable work, such wage represents a shift differential or higher wages because of the character of the work done or the time at which he is required to labor rather than an overtime premium*. **Such payments enter into the determination of the regular rate of pay**.*

*Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 468–69 (1948) (emphasis added).

55.    FLSA regulations 29 C.F.R. § 778.207(b) also requires that employers must include shift differential pay when determining an employee's regular rate of pay.

56.    What's more, the FLSA requires that shift differential pay is to be included when calculating an employee's overtime rate. *See* Fact Sheet #54 – *The Health Care Industry and Calculating Overtime Pay*; *see also Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 468 (1948).

57.    The shift differential pay is offered to employees for extra pay for undesirable hours and is advertised to Defendants' non-exempt employees in advance of employees being scheduled for the shifts that qualify for shift differential pay.

58.    The shift differential pay is paid as part of Plaintiff and the Class Members' usual wages and treated as compensation along with Plaintiff and Class Members' base salaries.

59.     The shift differential pay is intended to incentivize Plaintiff and the Class Members to work shifts that are harder to staff because the hours during the second and third shifts are unappealing. The shift differential pay bonus is guaranteed so long as Plaintiff and the Class Members pick up and complete second and/or third shifts.

60.     Plaintiff and the Class Members know about the shift differential pay from verbal communication from Emily Baldwin, Defendants' Director of Nursing at the Currituck location, during pre-shift huddles that included multiple employees, and through email correspondence from Defendants. So naturally it follows, that Plaintiff and the Class Members expect to receive the shift differential pay following completion of second and/or third shifts.

61.     Defendants, however, do not accurately include the shift differential pay bonus in their determination of each employee's regular rate for purposes of calculating overtime pay due for hours worked over forty in any given work week.

62.     Therefore, Defendants do not pay overtime wages on the portion of their employees' earnings attributable to the shift differential pay, which properly should be included in the calculation of each employee's regular rate, for purposes of calculating the overtime rate.

63.     Defendants' non-exempt healthcare employees are entitled to have their shift differential pay included in the determination of their regular rate for purposes of calculating overtime pay due for hours worked over forty in any given work week.

64.     Defendants' failure to pay overtime wages on the shift differential portion of their employees' hourly wages violates the FLSA.

**Defendants Fail To Pay Class Members For All Hours Worked**

65.     In addition to shift differential pay, Plaintiff's off-the-clock time was also not included in her overtime wages by Defendants.

66.     Indeed, Defendants did not compensate Plaintiff for all hours worked, including

Defendants' calculations of overtime pay for its employees. And, upon information and belief, Defendants did not compensate those similarly situated to Plaintiff for all hours worked, including Defendants' calculations of overtime pay for its employees.

67.     Throughout the relevant time period, Plaintiff and those similarly situated were permitted and/or required to work additional time outside of their shifts for work-related tasks. These tasks included, but were not limited to, loading the cart with sheets, pillow cases, bathroom pads, bread spreads, briefs, gloves and other supplies necessary for Plaintiff and those similarly situated to care for Defendants' patients, transporting the cart to necessary destinations in the Currituck facility, checking on residents, locating and gathering equipment and supplies, responding to emergencies, reviewing or completing charting, interacting with facility staff, patients and their families, and cleaning.

68.     Moreover, despite being precluded by Defendants from clocking in before their scheduled shifts, Plaintiff and those similarly situated were trained to do pre-shift work in order to be effective in carrying out their necessary duties of bathing, feeding, and caring for Defendants' elder residents.

69.     Plaintiff was actively discouraged from logging off-the-clock time. However, due to the high demands of the job, Plaintiff routinely performed work-related tasks outside of her scheduled shift, before and after she clocked in, with Defendants' knowledge of the work.

70.     Specifically, Plaintiff typically worked off-the-clock for two (2) to four (4) hours a week. Plaintiff observed that other similarly situated employees also performed off-the-clock work-related tasks. These tasks included, but were not limited to, loading the cart with sheets, pillow cases, bathroom pads, bread spreads, briefs, gloves and other supplies necessary for Plaintiff and those similarly situated to care for Defendants' patients, and transporting the cart it to

necessary destinations within the Currituck facility, checking on the residents, locating and gathering equipment and supplies, responding to emergencies, reviewing or completing charting interacting with facility staff, patients and their families, and cleaning.

71. Upon information and belief, Defendants treat similarly situated employees similarly with respect to the "off-the-clock" work and did not accurately record and track all of the hours worked by Plaintiff and other aggrieved employees. Defendants' policy was that the earliest an employee could clock in before a scheduled shift was seven (7) minutes. However, Plaintiff witnessed, as it was common practice, similarly situated employees engaging in pre-shift work before clocking in seven (7) minutes, prior to their scheduled shift. Therefore, Defendants failed to compensate Plaintiff and other similarly situated employees at one and one-half (1 ½) times the regular rate of pay for hours worked over forty (40) hours in a workweek.

72. As a result of these practices, Defendants have failed to maintain accurate and compliant wage records of all hours that Plaintiff and other aggrieved employees have worked.

## DEFENDANTS WILLFULLY VIOLATED THE FLSA

73. Defendants' actions in violation of the FLSA were and are made willfully in an effort to avoid liability under the FLSA. Specifically, the shift differential pay and the off-the-clock pay should have been included in calculating employees' overtime rates of pay. Such willfulness is demonstrated by, or may be reasonably inferred from, Defendants' actions, non-action and failures to act.

74. Defendants knew or should have known that the shift differential pay should have been properly incorporated into the regular rate for purposes of calculating overtime compensation under the FLSA.

75. Defendants knew or should have known that the off-the-clock pay should have

been properly incorporated into the regular rate for purposes of calculating overtime compensation under the FLSA.

76.     Defendants are sophisticated national businesses with access to knowledgeable human resource specialists and competent labor counsel.

77.     What's more, Defendants knew or should have known that the shift differential and off-the-clock pay should have been properly incorporated into the regular rate for purposes of calculating overtime compensation under the FLSA due to the multiple lawsuits in which plaintiffs have alleged various wage and hour claims related to mandated overtime pay requirements under the FLSA.

78.     Defendants had plenty of opportunities to pay Plaintiff and those similarly situated all overtime compensation owed. After Plaintiff engaged Defendants in a coordinated effort to receive all overtime compensation owed, Defendants had plenty of opportunities to reverse their wrongdoing.

79.     By failing to pay all the overtime compensation owed to Plaintiff and other hourly employees, Defendants acted willfully and in reckless disregard of clearly applicable FLSA provisions.

## COLLECTIVE ALLEGATIONS

80.     Plaintiff incorporates by reference the foregoing allegations as if set forth herein.

81.     On information and belief, the FLSA Collective consists of hundreds of similarly situated non-exempt healthcare employees who are paid on an hourly basis.

82.     The vast majority of the members of the FLSA Collective worked overtime hours regularly during their employment with Defendants.

83.     The employees in the FLSA Collective have been the victims of Defendants'

common policies and practices that have violated their rights under the FLSA and its implementing regulations by denying them their properly calculated overtime wages on the portion of their wages attributable to the shift differential pay.

84. Defendants' unlawful conduct has been willful and has caused significant damage to Plaintiff and the FLSA Collective.

85. The FLSA Collectives would benefit from the issuance of a Court-supervised notice of the present lawsuit and the opportunity to join the present lawsuit. These employees are known to Defendants and are readily identifiable through Defendants' records. The employees should be notified of and allowed to opt into this action pursuant to 29 U.S.C. § 216(b).

## CLASS ACTION ALLEGATIONS

86. Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of herself and the North Carolina Class defined above.

87. The members of the North Carolina Class are so numerous that joinder of all members is impracticable.

88. Defendants have engaged in the same conduct towards Plaintiff and the other members of the North Carolina Class.

89. The injuries and damages to the North Carolina Class present questions of law and fact that are common to each class member within the North Carolina Class, and that are common to the North Carolina Class as a whole.

90. Plaintiff will fairly and adequately represent and protect the interests of the North Carolina Class, and all of its putative class members because there is no conflict between the claims of Plaintiff and those of the North Carolina Class, and Plaintiff's claims are typical of the claims of the North Carolina Class.

91.     Plaintiff's Counsel are competent and experienced in litigating class actions and other complex litigation matters, including wage and hour cases like this one.

92.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the North Carolina Class predominate over any questions affecting only individual Class members including, without limitation: (1) whether Defendants paid them for all time worked; and (2) whether Defendants failed to pay them the full amount of overtime compensation earned.

93.     Plaintiff's claims are typical of the claims of the North Carolina Class in the following ways, without limitation: (a) Plaintiff is a member of the North Carolina Class; (b) Plaintiff's claims arise out of the same policies, practices and course of conduct that form the basis of the claims of the North Carolina Class; (c) Plaintiff's claims are based on the same legal and remedial theories as those of the North Carolina Class and involve similar factual circumstances; (d) there are no conflicts between the interests of Plaintiff and the North Carolina Class members; and (e) the injuries suffered by Plaintiff are similar to the injuries suffered by the North Carolina Class members.

94.     Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated individuals to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. The North Carolina Class is readily identifiable from Defendants' own employment records. Prosecution of separate actions by individual members of

the North Carolina Class would create the risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

95.     A class action is superior to other available methods for adjudication of this controversy because joinder of all members is impractical. Further, the amounts at stake for many of the North Carolina Class members, while substantial, are not great enough to enable them to maintain separate suits against Defendants.

96.     Without a class action, Defendants will retain the benefit of their wrongdoing, which will result in further damages to Plaintiff and the North Carolina Class. Plaintiff envisions no difficulty in the management of this action as a class action.

**COUNT I**
**Violation Of The FLSA**
**(On Behalf Of Plaintiff And The FLSA Collective Against All Defendants)**

97.     Defendants are "employers" within the meaning of 29 U.S.C. §§ 203(c) and 206(a).

98.     Plaintiff and the members of the FLSA Collective were or are "employees" within the meaning of 29 U.S.C. §§ 203(e) and 206(a).

99.     Plaintiff and the FLSA Collective are not exempt from the requirements of the FLSA.

100.    29 U.S.C. § 207 requires Defendants to pay non-exempt employees one-and-one-half times their regular rate of pay for all hours worked over forty in a work week.

101.    Plaintiff and the FLSA Collective are entitled to be paid overtime compensation for all hours worked over forty in a work week.

102.    The FLSA defines the "regular rate" as including "all remuneration for

19

employment paid to, or on behalf of, the employee[.]" 29 U.S.C. § 207(e).

103. The Supreme Court has held that the term "regular rate" "obviously means the hourly rate actually paid the employee for the normal, non-overtime workweek." *Bay Ridge v. Operating Co. v. Aaron*, 334 U.S. 446, 460 (1948) (quoting *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 40 (1944)).

104. With a few limited exceptions, all remuneration given to an employee must be included in the employee's regular rate calculation. *See* 29 U.S.C. § 207(e); 29 C.F.R. § 778.108.

105. The shift differential pay should be included in Plaintiff's and FLSA Collective Members' regular rate.

106. Plaintiff and the FLSA Collective were not compensated for all hours worked, including Defendants' calculations of overtime pay for its employees.

107. Defendants are required under the FLSA to include off-the-clock work time and shift differential pay in Plaintiff's and the FLSA Collective Member's overtime rate.

108. Defendants have denied overtime compensation, including the requisite calculations off-the-clock work time and the shift differential pay portion, of the hourly wages of each member of the FLSA Collective.

109. Defendants' actions violated and continue to violate the FLSA and its implementing regulations.

110. In violating the FLSA, Defendants acted willfully and with reckless disregard of clearly applicable FLSA provisions.

111. As a result of Defendants' willful violations of the FLSA, Plaintiff and the FLSA Collective have suffered damages by being denied overtime wages in accordance with the FLSA

and its implementing regulations, in amounts to be determined at trial, and are entitled to recovery of such amounts, as well as liquidated damages, pre-judgment interest, post-judgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b). Because Defendants' violations of the FLSA have been willful, a three-year statute of limitations applies pursuant to the FLSA, 29 U.S.C. § 255(a).

**COUNT II**
**Violation Of The North Carolina Wage And Hour Act**
**(On Behalf Of Plaintiff And The North Carolina Class Against All Defendants)**

112. Count II arises from Defendants' policy of suffering or permitting Plaintiff and the North Carolina Class members to work without timely paying all promised and earned wages for all hours worked in violation of N.C. Gen. Stat. §§ 95-25.6.

113. Defendants violated N.C. Gen. Stat. §§ 95-25.6 by failing to pay Plaintiff and North Carolina Class members all earned wage payments on the employees' regular payday for all hours worked.

114. North Carolina's Wage and Hour Act ("WHA") requires an employer to pay all wages due to its employees. *See* N.C. Gen. Stat. § 95-25.6.

115. Defendants are subject to the wage requirements of the WHA because Defendants are employers under N.C. Gen. Stat. § 95-25.2(5).

116. At all relevant times, Plaintiff and the North Carolina Class members are covered employees entitled to the above-described WHA's protections. *See* N.C. Gen. Stat. § 95-25.2(4).

117. Plaintiff and the North Carolina Class are not exempt from the requirements of the WHA for wage payments.

118. Defendants, pursuant to their policies and practices, failed and refused to pay overtime compensation for all hours worked over forty (40) in a workweek to Plaintiff and members of the North Carolina Class in violation of the WHA. *See* N.C. Gen. Stat. § 95-25.15(b).

119.    Defendants have intentionally failed to pay the wages due to Plaintiff and the North Carolina Class in violation of N.C. Gen. Stat. § 95-25.6.

120.    Defendants are not permitted by state or federal law, or by order of a court of competent jurisdiction, to withhold or divert any portion of Plaintiff's and the North Carolina Class members' wages that concern this lawsuit.

121.    Defendants do not have written authorization from Plaintiff or any members of the North Carolina Class to divert or withhold any portion of their wages that concern this lawsuit.

122.    Pursuant to N.C. Gen. Stat. § 95-25.22, an employer who fails to pay an employee wages in conformance with the WHA shall be liable to the employee for the wages or expenses that were not paid, interest, liquidated damages, court costs, and attorneys' fees incurred in recovering the unpaid wages.

123.    In violating North Carolina law, Defendants acted willfully and with reckless disregard of clearly applicable WHA provisions.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff seeks the following relief on behalf of herself and all others similarly situated:

a.    An order permitting this litigation to proceed as an FLSA collective action pursuant to 29 U.S.C. § 216(b);

b.    Prompt notice, pursuant to 29 U.S.C. § 216(b), of this litigation to all potential FLSA Collective members;

c.    An order permitting this litigation to proceed as a class action pursuant to Fed. R. Civ. P. 23 on behalf of the North Carolina Class;

d.    Back pay damages (including unpaid overtime compensation, unpaid spread of hours payments and unpaid wages) and prejudgment interest to the fullest extent permitted under the law;

e.    Liquidated damages to the fullest extent permitted under the law;

f.      Punitive damages as permitted under the law;

g.      Litigation costs, expenses and attorneys' fees to the fullest extent permitted under the law; and

h.      Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues of fact.

Dated: September 12, 2022                    Respectfully submitted,

*/s/ Jeffrey L. Osterwise*
Jeffrey L. Osterwise*
NC Bar No. 39272
Camille Fundora Rodriguez
PA Bar No. 312533
Alexandra K. Piazza
PA Bar No. 315240
Reginald L. Streater
PA Bar No. 326878
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000
Fax: (215) 875-4604
josterwise@bm.net
crodriguez@bm.net
apiazza@bm.net
rstreater@bm.net

*Local Civil Rule 83.1(d) Counsel for Plaintiff

*Counsel for Plaintiff, the FLSA Collective, and North Carolina Class*